SAMUEL, Judge.
The defendant insurer has prosecuted this appeal from an adverse judgment awarding plaintiff $2,030 for the loss he incurred when his car was stolen plus penalties and attorney’s fees pursuant to LSA-R.S. 22:658 for defendant’s arbitrary actions in processing plaintiff’s claim.
When the plaintiff bought the new automobile on May 18, 1964 he insured it with the defendant under a policy including loss due to theft. The car was stolen on September 13, 1965 while parked near the residence of plaintiff’s son in New Orleans. The theft was reported to defendant’s representative two days later. Within a week of the theft the vehicle was recovered by members of the Jefferson Parish Sheriff’s Department and towed to a garage. Moving the vehicle was difficult because, among other things, the motor and two wheels had been stripped from the body. Insofar as shown by the record before us, plaintiff was being charged $1 per day for storage.
On September 29, 1965 defendant’s representative and a body repairman went to the garage to make an estimate of the theft loss. Defendant’s adjustor then requested permission to tow the car to a repair shop where the insurer proposed to have it repaired with a used motor and used parts at a cost of $643.16. Plaintiff objected to the use of a second-hand motor and parts and did not authorize repair.
During the next two and one-half months, plaintiff’s attorney and defendant’s claims manager disputed the amount of depreciation plaintiff’s claim would be reduced by if new parts were used. The insurer at this time proposed a 50% depreciation because the car had traveled 27,000 miles when it was stolen. How this rate of depreciation was computed is not apparent because at the trial two automobile repair experts called by defendant testified the depreciation on the motor should have been between 25% and 33i%'%. Between October and mid December, 1965 the car remained with the garage but it moved the vehicle from a place near the building into an adjacent vacant lot owned by the garage operators. The loss increased because more parts were stripped from the car following its removal to the lot.
In December plaintiff’s attorney submitted an estimate to defendant for $1,776.96 and made a formal demand for payment. In response defendant proposed to have the car repaired with new parts pursuant to a $959.53 estimate. However, defendant still insisted on a substantial depreciation and did not name a percentage. Defendant never made a tender or offer other than as above set forth. By March 22, 1966 the car, still in the lot next to the garage, had been completely stripped. Plaintiff ob *436 tained a repair estimate of $1,980.77 from an appraisal company, but since the estimated retail value of the car after repair was $1,730, it was rated as a total loss. On March 22, 1966 plaintiff’s attorney demanded $2,045.20, which included loss through theft and cost to plaintiff for rental of a substitute car, and submitted a formal proof of loss therefor. Within a week defendant’s claim manager offered to have the car repaired per its $959.53 estimate and again insisted on depreciation without setting the rate therefor. In July, 1966 plaintiff was notified by parish officials the car would be submitted for sale at public auction unless claimed and released. Plaintiff forwarded the notice to defendant; nothing was done; and the vehicle was declared abandoned and sold.
From the foregoing it is apparent the initial loss was greatly compounded while the car was in storage. Thus, in fixing liability we are primarily concerned with whether plaintiff’s policy insured him against the loss occasioned by the subsequent theft or thefts.
Defendant denies liability for loss that occurred during the period of storage on the theory plaintiff, in effect, abandoned the car to the insurer by failing to take any action once it was in the garage, thereby violating a policy condition requiring the insured to protect the vehicle in the event of a loss and providing any further loss due to the insured’s failure to protect shall not be recoverable under the policy. We find no merit in this contention. When the car was recovered after the initial theft it was towed to the garage for storage. As we have pointed out, plaintiff was charged a storage fee of $1 per day and at all times thereafter the vehicle remained in the custody of the garage. There appears to be no dispute that the car was in storage because the correspondence exchanged between the litigants specifically discusses storage charges. In our opinion, under these circumstances once the car was placed in storage and remained there plaintiff’s duty to protect the vehicle was fulfilled.
The car remained in the care of the garage during the six month interval between the initial theft and the complete stripping of the vehicle. Thus, coverage for the additional theft continued through the time the car was stripped bare. Although we find plaintiff ultimately did abandon the automobile when he permitted its sale by parish officials, at this point his action had no effect on whether there was coverage. Four months prior to that sale it had been appraised as, and was, a total loss. Therefore, at that time the maximum coverage afforded plaintiff under the policy had been reached. It is true the insured was charged with the responsibility of mitigating damages, but when he abandoned the vehicle it had no salvage value whatsoever.
In concluding the insurer’s coverage against theft continued through the time the vehicle became a total loss, we have answered defendant’s second contention that plaintiff failed to prove the amount of the loss. That argument is based on the theory defendant was responsible for the initial theft only and plaintiff had failed to obtain an estimate until further loss had occurred while it was in storage. The $1,730 estimate obtained by plaintiff was explained by one of the appraisers and fully supports the award.
Defendant further contends the trial court improperly awarded plaintiff $300, the policy limit allowed for rental of a substitute automobile. It is agreed this amount is due only when the insured is required to rent a car because the theft deprives him of the use he previously made of the lost vehicle. Defendant contends the car was registered to plaintiff, but had been paid for and used by James Spano, his minor son.
Plaintiff testified he made a down payment on the car and paid the monthly finance charges with cash. He said he kept *437 it at his home in Kenner and used it as an owner. He further testified when the car was stolen he was required to rent a substitute car from his brother-in-law for transportation to and from work.
This testimony is contradicted by a statement given the insurer by plaintiff’s son, James Spano. The statement reads in part:
“ * * * On May 18, 1964, I purchased a new 1964 Chevy II from Bryan Chevrolet for $2,320 plus $68.21 tax. I put $300 cash down and financed the balance with Associates Discount Corporation, however as I was under age, the car was financed under my father’s name, John A. Spano. * * * ”
The statement also reads to the effect that young Spano, who lived in New Orleans several miles from plaintiff’s Kenner residence, regularly used the vehicle as owner. We note again that the original theft occurred at young Spano’s residence. Defendant’s claim manager testified he took the statement and it was admitted in evidence without objection. Young Spano was not called as a witness and the record contains no evidence explaining the contradictory testimony given by father and son.
In view of the conflicting evidence with respect to ownership and use of the car, plaintiff has failed to establish, with the required legal certainty, that the theft required him to rent a substitute automobile. It is questionable that he actually had use of the car, regular or otherwise; and it is highly improbable that he regularly used the vehicle in driving to and from his work. We therefore conclude plaintiff is not entitled to the $300 award for rental of a substitute automobile.
Finally, defendant contends the award of penalties and attorney’s fees under LSA-R.S. 22:658 is improper because there existed a real question as to the amount of the loss. The act permits an insured to recover penalties and attorney’s fees if his insurer fails to pay a loss within 60 days of submission of proof of loss and demand therefor, “ * * * when such failure is found to be arbitrary, capricious, or without probable cause * * * ” Where a dispute arises over the amount due, the insurer must tender the amount it thinks is just, even though tender is rejected by the insured. Further, if the insurer conditions its offer to pay the undisputed amount on the insured’s acceptance thereof in full settlement, it is no tender within the contemplation of the act. Sensat v. State Farm Fire and Casualty Company, La.App., 176 So.2d 804.
In the instant case, no valid tender was made. Defendant first proposed repairing the car with used parts, including a motor taken from a wrecked automobile. When plaintiff requested a new motor and new parts, with plaintiff bearing some depreciation costs, the defendant agreed to use a new motor and parts provided plaintiff pay 50% of the repair bill. Defendant’s own witnesses established the arbitrary manner in which the claim was handled. Although defendant’s two experts fixed a proper depreciation at between 25% and 33¡/3% on the motor, defendant demanded 50% and failed to make tender of a sum certain. Defendant concedes a loss occurred and all of its offers to settle required plaintiff to give a full release in exchange. Under Ensenat and the jurisprudence discussed therein, we conclude the imposition of penalties and attorney’s fees was justified.
For the reasons assigned, the judgment appealed from is amended to reduce the award from $2,030 to $1,730. As thus amended, and in all other respects, the judgment appealed from is affirmed; costs in this court to be shared equally by both litigants.
Amended and affirmed.