867 So.2d 819 (2004)
Donald E. DELESDERNIER and Lea B. Delesdernier
v.
LOUISIANA HEALTH SERVICE AND INDEMNITY COMPANY d/b/a Blue Cross Blue Shield of Louisiana.
No. 2003-CA-1135.
Court of Appeal of Louisiana, Fourth Circuit.
February 4, 2004.
*820 Michael R. Delesdernier, Metairie, LA, for Plaintiff/Appellee.
John E.W. Baay II, Gieger, Laborde & Laperouse, L.L.C., New Orleans, LA, for Defendant/Appellant.
(Court composed of Judge DENNIS R. BAGNERIS, SR., Judge TERRI F. LOVE, and Judge MAX N. TOBIAS, JR.).
MAX N. TOBIAS, JR., Judge.
This case involves a dispute over the denial of coverage for surgical procedures and medical care ostensibly covered under a conversion policy issued by Louisiana Health Services & Indemnity Company d/b/a Blue Cross and Blue Shield of Louisiana ("Blue Cross") to the plaintiff, Donald E. Delesdernier ("Delesdernier"). Blue Cross denied coverage to Delesdernier for surgical procedures performed at Ochsner Medical Center and Ochsner Clinic (collectively "Ochsner") on the grounds that the lifetime maximum benefits for major medical coverage had been exhausted. Delesdernier sued Blue Cross, asserting that *821 the principles of equitable estoppel should apply based upon the pre-approval of the procedures in question by Blue Cross as well as its acceptance of the premium payment subsequent to the date on which Blue Cross asserts the lifetime maximum was met.
On 15 December 1991, Blue Cross issued an Individual Conversion Comprehensive Major Medical Contract ("the policy") to Delesdernier after his employer cancelled the group insurance plan under which he had been previously insured. According to Blue Cross, the policy, schedule of benefits, and all endorsements to the policy were delivered to Delesdernier via U.S. mail. The terms of the policy itself do not provide a lifetime limit on benefits for comprehensive medical expenses. The Schedule of Benefits accompanying the policy, however, includes the following: "Comprehensive Medical Expense Maximum $20,000.00 per lifetime; $10,000 per calendar year." The Schedule of Benefits provided in the record is dated 29 September 1998 and shows an "amended effective date" of 15 December 1991, the date on which the policy was issued to Delesdernier. Blue Cross claims that the Schedule of Benefits was mailed to Delesdernier contemporaneously with the policy; Delesdernier does not recall receiving the Schedule of Benefits nor does he recall being notified that the lifetime benefit limit had been lowered from that of the original group policy under which he had been covered with his employer.[1]
In December 1997, Delesdernier's physicians recommended surgery to remove certain blockages.[2] Delesdernier scheduled the surgical procedures for 13 and 18 February 1998 at Ochsner. On 12 February and 17 February 1998, a representative of Ochsner contacted Blue Cross to verify that Delesdernier was covered under a policy issued by Blue Cross for the procedures to be performed on the respective next day. Each time the Ochsner representative contacted Blue Cross, coverage for Delesdernier was verified. The parties stipulated that a representative of Ochsner would have testified at trial that pre-certifications by a health insurance company are not guarantees of payment.
Delesdernier went ahead with the procedures recommended by his physicians and was notified by Blue Cross in an explanation of benefits dated 23 February 1998 that his maximum lifetime benefit of $20,000.00 had been exhausted in February 1998 and that they would not pay for the cost of the surgery that he had already undergone in February. Delesdernier stipulates that at no time prior to March 1998 was he advised that his lifetime maximum benefit was $20,000.00 and that it had been exhausted. As a result of Blue Cross' refusal to cover the surgical procedures, Delesdernier paid Ochsner $34,670.56 to satisfy the medical bills he had incurred. He asserts that even if the lifetime benefit policy limit was $20,000.00, he had actually received well over $20,000.00 in benefits from Blue Cross before February 1998 and that Blue Cross' continued coverage and acceptance of his premium payments should act to estop it from denying coverage of the claims in question.
*822 The parties submitted a detailed stipulation of testimony and several exhibits to the trial court. After taking the matter under advisement, the trial court entered judgment in favor of Delesdernier for the sum of $25,989.83 plus legal interest and costs of the proceedings.[3] In its reasons for judgment, the trial court found that Blue Cross had previously paid benefits over and above the $20,000.00 limit, but that in spite of the exhaustion of the lifetime maximum benefits by Delesdernier that Blue Cross sought to enforce, it continued to receive premiums from him. The trial court noted that even if Blue Cross' position was correct regarding the exhaustion of limits under the policy, it had been receiving a "gratuity" in premiums for some time from Delesdernier, who clearly was under the impression that he had medical coverage. The trial court further pointed out that Blue Cross had approved the surgical procedures prior to their being performed.
The trial judge reasoned that pursuant to the principle of equitable estoppel, or estoppel in pais, Blue Cross was not in a position to deny coverage for the medical procedures performed at Ochsner. The court cited Wilkinson v. Wilkinson, 323 So.2d 120, 126 (La.1975), in which the Supreme Court held that a party may be barred from asserting rights it might otherwise have by virtue of its voluntary conduct. The court enumerated the three elements of equitable estoppel as: (1) a representation by conduct or word by the party being estopped; (2) a justifiable reliance on that representation by another party; and (3) a change in the other party's position or conduct to his or her detriment because of that reliance. Id. The court further quoted Maddox v. Keen, 33,072, p. 5 (La.App. 2 Cir. 4/7/00), 756 So.2d 1279, 1283, in support of its judgment: "The doctrine of equitable estoppel is designed to prevent a miscarriage of justice by preventing one from taking a position contrary to his prior acts, admissions, representations, or silences when another has changed his position in detrimental reliance thereon."
Although Delesdernier made a claim for statutory penalties and attorneys' fees against Blue Cross for denying coverage for his surgeries, the trial court declined to award them, because it found that "[i]n this matter a literal interpretation of the policy would support the position of Blue Cross." Therefore, the court only awarded Delesdernier the amount of those medical costs that would have been covered had Blue Cross' actions not invoked the doctrine of equitable estoppel.
Blue Cross appeals the judgment of the trial court on three grounds: (1) the trial court erred when it found that equitable estoppel applied to the plaintiff's claim and in expanding the coverage defined in the policy; (2) the trial court erred when it found that a pre-admission certification of benefits constituted a guarantee to pay for the charges incurred; and (3) the trial court erred when it applied the coinsurance provision of the individual policy and failed to accept Blue Cross' calculation of the benefits due pursuant to the terms of the policy. Delesdernier's only assignment of error is the trial court's failure to award statutory penalties and attorneys' fees.
Blue Cross first argues that the doctrine of estoppel was improperly used in this case to expand coverage provided *823 for in the policy and cites several cases in support of its argument. In Balehi Marine, Inc. v. Firemen's Ins. Co. of Newark, New Jersey, 460 So.2d 16 (La.App. 1 Cir. 1984), the First Circuit denied coverage to the plaintiff for the collapse of a steel building because the hazard of collapse was not one contemplated by the policy by its terms and because the policy required that any hazards beyond those outlined by the policy be reflected in endorsements to the policy. The court held that the theory of estoppel cannot be used to extend coverage "beyond that set forth in the policy." Id. at 17-18, citing, Hunter v. Office of Health Services, 385 So.2d 928, 937-38 (La.App. 2 Cir.1980). We find that this case, however, and others cited by Blue Cross, are distinguishable from the matter at hand. In the cases cited by Blue Cross, the plaintiffs were seeking coverage for specific damages or hazards clearly not contemplated by the terms of the policies in question.[4] The issue in the case sub judice is not whether Delesdernier's medical expenses were covered expenses under the terms of the policy, but rather whether the amount of coverage had been exhausted and whether Blue Cross' extension of coverage for several months and continued acceptance of premium payments caused Delesdernier to rely upon the continued coverage, thereby failing to secure additional insurance prior to undergoing the procedures recommended by his physicians.
Blue Cross further argues that the $20,000.00 lifetime maximum benefits amount was not exceeded prior to February 1998, contrary to what the trial court indicated in its judgment, because Blue Cross separated the benefits paid for prescription drug costs, which totaled $5,681.72, from the major medical benefits, which totaled only $19,995.29 as of 27 January 1998. We reject Blue Cross' argument on this point. Nowhere in the policy or in the Schedule of Benefits are prescription drug benefits excluded from the major medical benefits that are at issue. Blue Cross does not indicate whether the exclusion of prescription drug benefits are peculiar to this policy, or whether it is the general method for administering health insurance policies with lifetime maximum coverages.[5] Whatever the reason for the segregation of benefits, it is clear that Delesdernier was not aware that prescription drug benefits were not included in the total amount of major medical benefits. No written statement to support Blue Cross' position on this issue is in the record. In fact, under the terms of the policy, "Comprehensive Medical Expenses" are defined, in pertinent part, as:

* * *
c. Prescription drugs and medicines approved by the Food and Drug Administration or its successor for the condition being treated, which require a prescription by a Physician for use outside the Hospital.

*824 * * *
A close examination of the exhibits presented to the trial court reveals that the Explanation of Benefits mailed to Delesdernier dated 5 December 1997 clearly states that the "lifetime benefits paid for Don" totaled $25,597.13 as of that date. There is no indication on that statement that his lifetime benefits had been exhausted and, indeed, Blue Cross continued to cover his medical expenses until the claim was made for the first surgery performed to remove Delesdernier's blockages on 13 February 1998. The Explanation of Benefits dated 23 February 1998 codes every claim for benefits beginning with that surgery as "E64", which is keyed to denote "your major medical lifetime maximum has been met." In fact, it had ostensibly been met several months prior to that date, and it is not disputed that Blue Cross continued to collect premiums from Delesdernier through February 1998.[6]
Blue Cross further asserts that even if the two surgeries performed in February are found to be subject to coverage under a theory of estoppel, the surgeries and treatments rendered at Ochsner in March 1998 are not similarly subject to coverage because Delesdernier was made aware of the exhaustion of coverage prior to the dates of those procedures performed in March 1998. The dates of the medical procedures and services rendered in March 1998, appear to be 2 March, 5 March, and 11 March. Blue Cross argues that Delesdernier could not have reasonably relied on coverage with Blue Cross when he scheduled these procedures, as he was notified in late February 1998 that his coverage with Blue Cross had been exhausted. Indeed, Delesdernier seems to admit in his brief that the primary motivating force behind his medical treatment in March 1998 was that his physicians strongly recommended that he receive the treatments at that time for the benefit of his health. Although the exact date upon which Delesdernier learned that his coverage was being discontinued is not ascertainable from the record, we note that in Delesdernier's petition filed at the outset of this litigation alleges that:
Without notice and after the medical procedures were performed and medical cost incurred, Mr. Delesdernier was advised for the first time in late February of 1998 that defendant was denying the claim because Mr. Delesdernier's major lifetime maximum has been met.
Although Delesdernier testifies through stipulation that he was not informed that his coverage was being terminated until March 1998, we find that his assertion to the contrary in his petition constitutes a judicial admission, which can only be revoked on the grounds of error of fact. La. C.C. art. 1853; see also, C.T. Traina, Inc. v. Sunshine Plaza, Inc., XXXX-XXXX, p. 5 (La.12/3/03), 861 So.2d 156, 159. We note that no assertion has been made that the facts as originally plead by Delesdernier are incorrect factually; rather the later statement is merely a contradiction of the earlier assertion regarding when Delesdernier knew that his coverage was being terminated. Such a subsequent contradiction is not sufficient to revoke the earlier allegation of fact. Id. at 3, 861 So.2d at 158.
A close examination of the record reveals that of the $34,653.11 in medical bills *825 incurred by Delesdernier in February and March 1998, $7,845.05 of those bills are for treatment rendered in March. As such, that portion of the medical bills in question is not subject to coverage under the policy under a theory of estoppel. Thus, the award to Delesdernier must be amended to reflect 75% of $26,808.06, or $20,106.05.[7]
Next, Blue Cross argues that Delesdernier was not reasonably justified in relying on the pre-certification of the surgeries in question because it is clearly stated in the policy that the pre-admission certification process is not a guarantee of payment; rather, it is a check system for the hospital to determine whether the procedure is medically necessary and that the setting and length of stay are appropriate. The policy provides the following regarding the pre-admission certification:
"Pre-Admission Certification" means a procedure which consists of review and certification by Us prior to an Inpatient Admission, that a proposed Admission is both Medically Necessary and appropriate as to setting and length of stay. It is based upon information provided by the Member's Physician, Hospital, Designated Unit, or a representative thereof, applying medically accepted review criteria.

* * *
NOTE: The certification as to Medical Necessity and appropriateness of Inpatient care does not guarantee that the Contract in question will allow benefits. Contract provisions regarding eligibility, Exclusions/waiting periods will be applied once the actual claim is received."
(Emphasis in original.) The language in the policy makes it clear that the pre-admission certification does not guarantee coverage. Further, the parties stipulated that, if called to testify at trial, a representative of Ochsner would have testified "[t]hat pre-certifications are not guarantees of payment." Although Delesdernier may not have been aware of the distinction, he is charged with understanding the ramifications of a pre-admission certification, as they are clearly spelled out in the policy. Therefore, Delesdernier could not have justifiably relied on the pre-admission certification of his surgeries such that Blue Cross was estopped from denying coverage on the basis of the pre-admission certification.
Finally, Blue Cross argues that even if the disputed medical costs are found to be covered under the policy, the amount awarded by the trial court is excessive insofar as Delesdernier paid the total amount of the bills sent to him by Ochsner, which is substantially more than what Blue Cross would have been obligated to pay for those same bills under the policy. The policy provides, in pertinent part, as follows:

* * *

ARTICLE IICOMPREHENSIVE MEDICAL BENEFITS

* * *
C. Insuring Agreement
1. After the Comprehensive Medical Expenses Deductible, as shown on the Schedule of Benefits, has been met the Plan agrees to pay the percentage amount (Coinsurance) as shown on the Schedule of Benefits for incurred Comprehensive Medical Expenses, up to the Benefit *826 Period (calendar year) maximum as shown on the Schedule of Benefits....

* * *
The Schedule of Benefits provided that Blue Cross would be responsible for 75% of the comprehensive medical expenses incurred by Delesdernier, after the deductible had been exhausted. At trial, Blue Cross presented a printout of the amount it would have paid for each item paid by Delesdernier if those charges had been covered under the policy. The policy, as amended in 1992, provides the following definitions:
"Allowable Charge" means the lesser of the submitted charge or the amount established by [Blue Cross], based on an analysis of Health Care Provider charges, as the maximum amount allowed for all such Health Care Provider services covered under the terms of this Contract. (Emphasis in original.)

* * *
"Comprehensive Medical Expenses" means the Allowable Charge for Medically Necessary services incurred by the Member which are prescribed by the attending Physician.
(Emphasis in original.) Other than a chart provided by Blue Cross, which effectively reduces the amount of the submitted medical charges in dispute by more than one-half, there is no further evidence provided by either party to guide this court in determining whether the "allowable charges" as detailed by Blue Cross are properly applied to the case at bar. The chart introduced into evidence by Blue Cross, without any further underwriting or accounting documentation in support, is self-serving and not sufficient to carry the burden of proof on this issue.
Blue Cross cites Adler v. Hospital Service Ass'n of New Orleans, 278 So.2d 177 (La.App. 4th Cir.1973) in support of its argument to reduce the award. In Adler, the plaintiff paid surgeons' fees for procedures covered under the policy and submitted the bills to the defendant for reimbursement pursuant to the terms of the policy. The defendant paid only a portion of the bills submitted, arguing that the surgeons' bills were higher than would be "customary and reasonable," which is how the policy in question described expenses for which it would be responsible. The testimony of the plaintiff's physicians revealed that, in fact, his bills for treatment were inflated from those that would have normally been incurred by another patient because the plaintiff was very demanding and "demanded and received more care than would be necessary for at least two, and probably three, other patients under identical circumstances." Id. at 180. This court determined that the fees were not "customary and reasonable" and that the defendant was justified in refusing to pay the entirety of the claimed amount. The court, in its reasoning, found that "[its] conclusion, therefore, must be based on that fee which is customary and reasonable for the treatment which is customarily required by the average person because of his condition." Id. No evidence has been submitted to suggest what fees would have been "customarily required by the average person because of his condition" and there has been no allegation that Delesdernier required care above and beyond what the average person would have required for identical treatment. We are mindful that even if Blue Cross were due a discount for some or all of these charges, Delesdernier was obviously not entitled to any such discounts and paid the entire amount of the submitted charges.
In fact, Delesdernier argues that although Blue Cross asserts that it would *827 have only paid $15,891.67 for the disputed medical services, it did not elect to cover those charges and that now it should be held liable for the damages arising from its breach, which total $34,653.11. Delesdernier cites no legal authority for this position, although his argument is suggestive of the language found in La. C.C. art. 2315.[8] Delesdernier further reasons that Blue Cross had the opportunity to participate in the pricing of the medical services provided by Ochsner, but that it walked away from the bills and left Delesdernier to pay the full, uncontested amount.
Therefore, while we agree that Blue Cross may have had a right to discount a portion of the disputed medical expenses, we have no way of determining whether the costs as discounted by Blue Cross are accurate or reasonable. In light of the lack of evidence on this point, we cannot find that the trial court committed manifest error or was clearly wrong in awarding 75% of medical bills as submitted for which Blue Cross is responsible. This further supports our conclusion reducing the trial court's award from $25,989.83 to $20,106.05, which is 75% of the medical bills incurred in February 1998.
The only assignment of error raised by Delesdernier lies in the trial court's refusal to award penalties in his favor against Blue Cross. The trial court notes in its reasons for judgment that, according to a "literal interpretation" of the policy in question, Blue Cross was correct in limiting the benefits to Delesdernier. Therefore, it follows that Blue Cross was neither arbitrary nor capricious in refusing to pay for Delesdernier's medical treatments in February or March 1998. Delesdernier argues on appeal that Blue Cross was inconsistent in its actions towards him and that its conduct is sufficient to incur statutory penalties pursuant to La. R.S. 22:657, which provides, in pertinent part, that an insurer must pay all claims arising from health and accident policies issued in Louisiana within thirty (30) days from the date of the claim, unless "just and reasonable grounds, such as would put a reasonable and prudent businessman on his guard, exist." La. R.S. 22:657(A). As the trial court noted, under a literal interpretation of the policy issued to Delesdernier, Blue Cross' coverage had been exhausted. Therefore, it is arguable that "just and reasonable grounds" for refusing to pay the medical expenses in question existed. We find, therefore, that the trial court did not err in refusing to award statutory penalties and attorneys' fees for Blue Cross' failure to cover the disputed medical expenses.
In conclusion, we find that the trial court erred in awarding damages to Delesdernier for those medical costs incurred in March 1998 and after, insofar as Delesdernier's judicial confession undercuts any theory of estoppel which might otherwise support the entire award entered by the trial court. We affirm the trial court's award, however, for those medical expenses incurred by Delesdernier prior to and in February 1998, and find that the evidence supports an award of $20,106.05, or 75% of $26,808.06. Finally, we affirm the trial court's refusal to award statutory penalties to Delesdernier.
AMENDED; AFFIRMED AS AMENDED.
NOTES
[1] The original group policy obtained through Delesdernier's employer had a lifetime benefits limit of $2,000,000.00. Although a copy of the policy has not been provided to the court, Blue Cross has not contested this assertion by the plaintiff.
[2] Delesdernier's medical records are not made part of the record on appeal and there is no testimony regarding the specifics of his illness. For the purposes of this appeal, those specifics are not germane to the issues before this court.
[3] The trial court awarded Delesdernier 75% of the medical costs he incurred in February and March 1998 that Blue Cross refused to cover, because the Schedule of Benefits provided that Blue Cross would pay 75% of the eligible comprehensive medical expenses after the deductible had been exhausted.
[4] Monju v. Continental Cas. Co., 487 So.2d 729 (La.App. 5 Cir.1986) (insurance company not liable for sewer repairs where policy clearly excluded coverage for underground pipes); Rozas v. La. Hospital Service, Inc., 413 So.2d 364 (La.App. 3 Cir.1982) (insurance company not liable for treatment of an aneurysm and removal of blood clots were policy excluded "any disease of cerebro-vascular system; treatment for and complications therefrom").
[5] In its reply brief, Blue Cross suggests that the separation of prescription drug benefits from the major medical benefits was a "clerical error" and that the separation actually created a windfall to Delesdernier of over $5,000.00, which Blue Cross has not attempted to recover.
[6] The record reflects that the last premium payment made by Delesdernier was dated 9 February 1998. Delesdernier maintains, and Blue Cross does not dispute, that the premium payment made on that date was for the policy period ending 15 March 1998. There is no evidence of any refund to Delesdernier of any portion of that premium payment in the record.
[7] The figure $26,808.06 is $34,653.11 less $7,845.05 and represents the medical bills incurred in February 1998.
[8] Louisiana Civil Code article 2315(A) provides: "Every act whatever of man that causes damage to another obliges him by whose fault it happened to repair it."